IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 25, 2019 Session

## STATE OF TENNESSEE v. ALFRED MARON WILLIAMS, ERIC MARTEL ABRAMS, AND JAMIE PAUL CLICK

**Appeal from the Criminal Court for Knox County**
**No. 102707       Steven W. Sword, Judge**

_____

### No. E2018-00670-CCA-R3-CD

_____

A Knox County jury convicted the defendants, Alfred Maron Williams, Eric Martel Abrams, and Jamie Paul Click, of twelve counts of conspiracy to possess with the intent to sell heroin within 1000 feet of a drug-free school zone. The trial court merged these twelve convictions into one conviction for each defendant. The jury additionally convicted Defendant Williams of multiple other drug and firearms-related offenses. The trial court sentenced Defendant Williams and Defendant Click to effective sentences of twenty-five years of incarceration each, and it sentenced Defendant Abrams to twenty-one years of incarceration. All three defendants appeal. Defendants Williams and Click contend that the trial court erred when it failed to hold a pretrial hearing to determine whether a conspiracy existed. All three defendants contend that the evidence is insufficient to sustain their convictions for conspiracy. Defendant Click additionally contends that the trial court erred when it allowed him to be convicted of the common law crime of conspiracy. After a thorough review of the record and relevant authorities, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT H. MONTGOMERY, JR., JJ., joined.

Michael Whalen, Knoxville, Tennessee, for the appellant, Alfred Maron Williams.

J. Liddell Kirk (on appeal) and Chloe Atkins Akers (at trial), Knoxville, Tennessee, for the appellant, Eric Martel Abrams.

Wesley D. Stone, Knoxville, Tennessee for the appellant, Jamie Paul Click.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant

Attorney General; Charme P. Allen, District Attorney General; and Sean F. McDermott and Jennifer H. Welch, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from multiple drug transactions involving the sale and purchase of heroin. With regard to these transactions, the Knox County Grand Jury issued a presentment charging the defendants with twelve counts of conspiracy to possess with intent to sell or deliver a schedule I controlled substance, heroin. The presentment further alleged that the conspiracy took place within 1000 feet of a drug-free school zone. Defendant Williams was also charged with multiple other drug and firearms-related offenses.

At the trial on these charges, the parties presented the following evidence: Philip Jinks, an officer with the Knoxville Police Department ("KPD"), testified that he had been trained in undercover operations investigating drug conspiracies. This conspiracy investigation began after several residents in the Spring Valley Road area of Knoxville filed a drug complaint. As a result of this complaint, Detective Jinks began observing 5131 Spring Valley Road ("5131 Spring Valley"), and he saw an SUV that he later determined was registered to Defendant Williams pull up to the house. Defendant Williams exited the vehicle and entered the house from a side door. Shortly after Defendant Williams's arrival, "a lot of traffic began to come to the house." Multiple cars arrived and departed, staying for only brief periods of time. Detective Jinks obtained some of the license tag numbers from the vehicles. He said that the vehicle traffic was consistent both with the complaint regarding the house and also with drug dealing.

Detective Jinks conducted surveillance on 5131 Spring Valley for several days, and subsequently made a traffic stop of a vehicle leaving the home. As a result of the stop, Detective Jinks found in the driver's possession a small amount of heroin in a Ziploc-type baggie, which was "heat-sealed" or melted at the top. The detective had never before seen this type of packaging.

Detective Jinks testified that he contacted the Federal Bureau of Investigation ("FBI") because he was aware that FBI agents were conducting a heroin investigation in Knoxville. The FBI placed him in contact with the Tennessee Bureau of Investigation ("TBI") and the Sevierville Police Department. Sevierville Police Department officers informed him that they were conducting a heroin investigation that involved heroin packaged in small, heat-sealed Ziploc baggies. Those officers also gave Detective Jinks a description of a vehicle that they suspected was involved in the drug transactions.

2

Detective Jinks testified that he observed a Red Mustang, which matched the description provided by the Sevierville Police Department officers, at 5131 Spring Valley. He determined that the license tag number was registered to Co-Defendant Carla Heather Arwood. [1]

Detective Jinks said that he continued surveillance of 5131 Spring Valley, and in September of that year, after officers arrested Susie Broyles, a resident of the home, all activity at the home stopped. Detective Jinks interviewed Ms. Broyles, and, based on the interview, he began investigating a different residence located at 1926 Massachusetts Avenue ("1926 Massachusetts"). Detective Jinks began surveillance of that residence and noted the same type of activity that he had seen previously at 5131 Spring Valley. Detective Jinks testified that he observed a silver Ford Excursion that came and went from the residence and sometimes parked in the alley adjacent to the backyard.

Detective Jinks testified that he developed a confidential informant ("CI") to assist in his investigation. He met with the CI, and the detective decided to use the CI to make a controlled purchase at 1926 Massachusetts. After explaining the procedures of using a CI, Detective Jinks testified that on December 20, 2012, he recorded a phone call placed by the CI arranging for the purchase of drugs from 1926 Massachusetts. The recording of that phone call was admitted into evidence. The CI was outfitted with audio and visual recording equipment and sent into the residence to make the drug transaction. He then went to a predetermined location to meet Detective Jinks. At this time, he gave the officer nine small, heat-sealed bags containing a brownish-white powder and the recording equipment.

Detective Jinks described a second controlled buy made on January 8, 2013. He followed the same procedures, watched the CI enter 1926 Massachusetts, and retrieved the recording equipment from the CI following the buy. The CI again returned with nine "very small," heat sealed Ziploc baggies that contained the same brownish-white powder, which appeared consistent with heroin. Detective Jinks said that these bags he said were a little different in that they were stamped with an insignia.

Detective Jinks testified that on January 15, 2013, and based upon these two controlled drug buys, he sought and executed a search warrant for 1926 Massachusetts. The SWAT team initially entered 1926 Massachusetts and detained its occupants. Among the occupants were Defendant Williams, Tiffany Jones, and her boyfriend, Derek Miller, and Ms. Jones's juvenile son. Also present were Patrick Panella, Kevin Jolley,

---

[1] While Co-Defendant Arwood was one of these four defendants tried together, she did not appeal. We will, therefore, refer to her as "Co-Defendant" to make clear that she has not joined this appeal.

Samantha Skye Webb, and Elizabeth Jones. Detective Jinks said that officers secured Defendant Williams in the bathroom, and Detective Jinks retrieved from the toilet several of the heat-sealed black bags that contained a powder that was consistent with heroin. As officers assisted Defendant Williams in standing, they found that he was lying on a plate and money, and they also noted that he had a black metal clip of an "inside-the-pant" handgun holder. There was no weapon in the holster. Officers found a large, rubber-banded roll of cash in Defendant Williams's pants pocket. Defendant Williams also possessed a phone holder that contained two cellphones. Detective Jinks said that the cover was removed from the air vent near where Defendant Williams was found in the bathroom, and, inside the vent, officers found a loaded .45-caliber handgun.

In one of the bedrooms, Detective Jinks found a "large number of very small black heat-sealed bags containing heroin" on the floor. Ms. Jones was located in this room. On a table next to Ms. Jones's phone, officers found more black baggies and two small bags of what appeared to be marijuana. Detective Jinks said that the officers collected a total of twenty-four small black bags from the toilet and the bedroom floor.

Detective Jinks said that Mr. Miller was located, along with another individual, in a second bathroom in 1926 Massachusetts. The officers recovered in the home a large quantity of needles, which are associated with heroin use, and most of those were in the bedroom belonging to Mr. Miller and Ms. Jones. Officers removed four similar bags from Mr. Miller's "pocket." Detective Jinks also recovered spoons containing a residue that appeared to be from the preparation of heroin for injection.

Detective Jinks recalled that he found multiple empty baggies that appeared to have once been heat-sealed but subsequently opened and the contents "used." The officer also found a large Ziploc baggie containing unused small black baggies similar to the ones that contained the powdery substance. Detective Jinks found a keychain bearing the name "Tiffy." On the keychain were keys to 1926 Massachusetts, a Ford vehicle, and a Mercedes or BMW vehicle.

Detective Jinks testified that the day after the search warrant execution he went to an auto repair shop where he found a silver Ford Excursion and a white Buick Roadmaster that he had seen in this investigation. He had seen the Excursion parked numerous times on Massachusetts Avenue, and he once saw Defendant Williams parking the Excursion. Detective Jinks seized the vehicles. He also obtained search warrants for the phones he found at 1926 Massachusetts. He interviewed Ms. Jones and Mr. Miller.

Detective Jinks testified that he also interviewed Co-Defendant Arwood. She said that she was a heroin user and that she had begun buying heroin from "Jessica and Jersey" in the Arbor Place Apartments. She had also been to 5131 Spring Valley, where

4

she purchased heroin from "Susan Broyles." Co-Defendant Arwood said that, after some period of time, she began purchasing heroin for resale as well as for her own consumption. She would purchase heroin at 5131 Spring Valley for $10 a bag and then sell it in Sevier County for $15 to $20 a bag. She told the detective that she came to Knox County three to five times a week and purchased between five and twenty bags of heroin. Co-Defendant Arwood said that, on these occasions, she drove either a red truck or a red Mustang.

Detective Jinks testified that the names "Jersey and Jess" came up throughout this investigation. He identified "Jersey" as Brian Addeo, and "Jess" as Jessica Christian. After identifying Mr. Addeo, he identified a woman named Carrie Roe. Detective Jinks interviewed Ms. Roe, and she identified a man named Jerome Brewer. Later, Mr. Brewer was arrested, and Detective Jinks recovered Mr. Brewer's phones from jail and obtained a search warrant for them.

Detective Jinks testified that he learned that Mr. Addeo had been arrested for an outstanding warrant and was in jail, so the detective had Mr. Addeo brought to his office for an interview. At that time, Detective Jinks confiscated the phone in Mr. Addeo's possession.

Detective Jinks testified that he conducted a traffic stop of Defendant Abrams, another man whom he had learned was involved in the illicit activity. He recovered two phones from Defendant Abrams during a traffic stop. He said he found "significant" information on those phones. The detective compared the contacts in all of the phones and the incoming and outgoing text messages, in addition to the data stored within the phones themselves. On that same day, March 21, 2013, Detective Jinks went to Arbor Place Apartments, number 442,[2] and he executed a search warrant there. Inside the unit, Detective Jinks found a digital scale and a razor blade inside a compartment in a speaker. He said, in his experience, digital scales were often found in conjunction with drugs during a drug investigation.

Detective Jinks testified about some of the evidence he found on the phones. He first discussed the Samsung "flip phone" later identified as belonging to Defendant Williams, which was found during the search warrant execution at 1926 Massachusetts Avenue.[3] The contacts saved within the phone included a contact for Mr. Addeo, Co-Defendant Arwood and Defendant Click, who were associated with the same phone

---

[2] Throughout the trial, this apartment complex is sometimes referred to as "Townview" and "Arbor Place" apartments. It is unclear if these are adjacent apartment complexes or part of the same apartment complex.

[3] In the interests of brevity and clarity, we will refer to these phones by their owners' names in later testimony.

number. The phone also included contacts for Defendant Abrams, Ms. Jones, and Angie Stafford.

Detective Jinks said he examined a second Samsung phone found at 1926 Massachusetts, later identified as belonging to Ms. Jones. That phone contained contacts for: Ms. Stafford; James Vaughn (a/k/a "Cohoas"); Defendant Click and Co-Defendant Arwood; Mr. Miller; Defendant Abrams; Mr. Addeo; and Defendant Williams.

Detective Jinks testified he examined Mr. Addeo's phone, which had "Jersey and Jess 4eva" and a picture of a child on the inside screen. That phone contained contacts for: Ms. Stafford; Defendants Click and Arwood; Defendant Abrams; Mr. Vaughn; and a contact for "Maul" and one for "Rome." Detective Jinks identified the telephone records that he subpoenaed, and the trial court admitted those records into evidence.

During cross-examination, Detective Jinks agreed that, when he interviewed Ms. Broyles, he told her that he knew she and Defendant Williams had applied for and obtained a business license together. She told him that they had started a home improvement and lawn care business and that Defendant Williams had purchased equipment in furtherance of that business. Ms. Broyles said that the business did not have a checking account. The detective informed her that he believed that the business was a sham to launder money. Ms. Broyles said that she was unsure of Defendant Williams's real name, referring to him as "Mumbies."4 Detective Jinks found Ms. Broyles "mostly truthful" in that she corroborated facts that he already knew to be true.

Upon further questioning, Detective Jinks testified that there were some instances in which Ms. Broyles was untruthful, such as her telling him that she left for work every day at 7:00 a.m., when Detective Jinks had seen her at home during the days that he conducted surveillance of 5131 Spring Valley. Ms. Broyles also told him that the people involved in purchasing heroin contacted Defendant Williams to do so, instead of her, but the phone records indicated that they also called Ms. Broyles. Ms. Broyles's information in other instances, however, was accurate and aided him in both this investigation and in investigating another drug conspiracy.

Detective Jinks agreed that he never attempted to have any of the people that he interviewed contact Defendant Williams. Some of the people he interviewed explained how the drug transactions worked, saying that they communicated through third-party intermediaries to purchase heroin, including: Ms. Stafford; Ms. Jones; Mr. Addeo; or Ms. Christian. Most of them did not buy directly from Defendant Williams. Some people

---

4 We note that Defendant Williams is also referred to as "Mumbles," but Ms. Broyles referred to him as "Mumbles."

indicated that they bought their drugs from "Mumbies" or "Mumbles," but then admitted that they had not personally seen him. Detective Jinks recounted that the CI had some discussion with Defendant Williams but that the controlled purchase was from Ms. Jones. Detective Jinks agreed that Ms. Jones was an addict and that she charged a bag of heroin as her price for doing business. He agreed that, during the controlled purchases, Ms. Jones took the money and exchanged the drugs, keeping one for herself.

In response to questioning about what evidence Detective Jinks found of a drug conspiracy at the 1926 Massachusetts Avenue address, he said that Defendant Williams was found with drugs around him and a gun, Ms. Jones was in the same room in the middle of a drug transaction, there were multiple cell phones in the home, two on Defendant Williams's person and one in the office on the table. Additionally, the phones contained text messages and records of communication. This taken together all indicated that there was a conspiracy between multiple people, including the defendants, to distribute heroin. He further stated that, in this case, his multiple interviews with dozens of people, the evidence and surveillance, and text messages all indicated that this was a conspiracy.

During further cross-examination, Detective Jinks testified that Carrie Roe was associated with Defendant Abrams and Mr. Jerome Brewer. Detective Jinks recalled that Ms. Roe was arrested for trespassing and spoke with Detective Jinks after her arrest. Ms. Roe told Detective Jinks that she had purchased heroin from Defendant Abrams, whom she always contacted by telephone. Detective Jinks did not find Defendant Abrams's contact information in Ms. Roe's phone, which she had with her at the interview. Ms. Roe told Detective Jinks that she also used crack cocaine. She further stated that, when she purchased heroin from Defendant Abrams, she did so at apartment 442 in the Arbor Place Apartments. She also said that she purchased heroin at other apartments in Arbor Place from Defendant Abrams and Mr. Brewer.

Detective Jinks agreed that the majority of the texts on Ms. Roe's phone were to Ms. Christian, Mr. Addeo, and Mr. Brewer. Ms. Roe told Detective Jinks that Defendant Abrams had introduced her to Mr. Brewer. Detective Jinks agreed that he never saw Mr. Abrams at 5131 Spring Valley or 1926 Massachusetts. Detective Jinks testified that during Ms. Roe's second interview she told him that Mr. Abrams was at "Townview" selling cocaine, but she did not mention heroin.

Detective Jinks testified that, when he executed the search warrant on 1926 Massachusetts and interviewed its occupants on subsequent occasions, Mr. Miller and Ms. Jones, he learned of the name "E" (also referred to as "Thumbs" or "Thumbs up") and the phone number associated with this individual. He learned that "E" sold heroin. He then later again heard about "E" from Ms. Roe. He determined "E" was Defendant

Abrams.

Detective Jinks testified that he searched Defendant Abrams's apartment twice, and he found only a digital scale. There were no other drugs or drug paraphernalia in the apartment. Defendant Abrams was arrested while driving his vehicle, and there was no heroin found in his vehicle. Defendant Abrams had with him two cell phones, neither of which Detective Jinks obtained the cell phone records for. He noted that the apartment was not in Defendant Abrams's name and that someone else had access to the apartment.

Detective Jinks testified that during many of his interviews neither Defendant Click's nor Co-Defendant Arwood's names were mentioned. He further said that, when he interviewed Co-Defendant Arwood, he found her cooperative. Co-Defendant Arwood told the detective that she purchased twenty bags of heroin three to five times per week and that she used more of the heroin than she resold.

During redirect-examination, Detective Jinks testified that he attempted to corroborate information he gleaned during his interviews. Detective Jinks testified that Ms. Roe had the phone number associated with Defendant Abrams saved as "Ernie" in her contacts. Further, Ms. Broyles and Mr. Miller both mentioned Defendant Abrams in their respective interviews.

Detective Jinks testified that, at the time he searched apartment 442, it was rented to a Stephanie Parker, who was Defendant Abrams's girlfriend. She was living in a different location on Pickett Avenue, and she canceled the lease to the apartment the day that Defendant Abrams was arrested.

Michael Bleakley, a special agent forensic scientist with the TBI, testified as an expert in forensic chemistry that he analyzed the powder obtained in Detective Jinks's controlled drug purchase using a CI. Agent Bleakley said that there was .06 grams of heroin in the Ziploc baggie, and that the gross weight of the additional powder, including the Ziploc bags, was 0.75 grams. His report noted that the total amount of powder would not exceed 15 grams of powder.

Carl Smith, with the TBI, testified that he analyzed the heroin that was seized during the search of 1926 Massachusetts, and determined that one submission contained 8.36 grams of heroin. He examined an additional eighteen Ziploc baggies that contained identical type powder, the gross weight of which would not have exceeded 15 grams. He also examined another submission and determined that it was marijuana.

The State offered multiple witnesses who were the custodians of records for the cell phones relevant to this case. These records showed communication between the cell

phones that were confiscated.

Brian Addeo testified that his nickname was "Jersey" because he was from New Jersey. He moved to Tennessee after a serious motorcycle accident, so that his sister could care for him. As a result of the accident, Mr. Addeo used multiple pain medications and also nerve medicine. He described himself as "addicted to . . . opiates" and heroin. Mr. Addeo admitted that he had been convicted of multiple offenses stemming from his drug addiction. One of those convictions involved the domestic assault of Ms. Christian, who was the mother of his son and with whom he also frequently used heroin and pain pills.

Mr. Addeo testified that he participated in the selling of heroin that led to this investigation and his eventual arrest in this case. Mr. Addeo recalled that the heroin that he purchased in New Jersey was sold in wax paper, and the heroin he bought in Tennessee came in small, black, heat-sealed Ziploc baggies. He said that he sold between ten and fifty bags of heroin daily, and he used all of the money he made to support his own drug habit.

Mr. Addeo identified Defendant Williams, whom he called "Mumbles," Defendant Abrams, whom he called "E" and also knew as "Thumbs Up," Defendant Click, and Co-Defendant Arwood. Mr. Addeo testified that he usually obtained the drugs that he used and resold from Defendant Williams but that he had also purchased drugs from Defendant Abrams and Defendant Click. He had not purchased drugs from Co-Defendant Arwood but had seen her with Defendant Click during "many" of the transactions. The two were usually in a red Mustang but also sometimes drove a truck. Mr. Addeo testified that he had personally seen Defendant Williams fill some of the black, heat-sealed baggies with heroin. The baggies usually contained less than a tenth of a gram of heroin and retailed for $10. Mr. Addeo said that, at the time of his arrest, he used as many baggies a day as possible, numbering twenty or more.

Mr. Addeo testified that, at some point, he began going to 5131 Spring Valley where Tiffany Jones, Derrick Miller, Susan Broyles and her boyfriend, Sean Cruz, all lived. There, he purchased heroin from Defendant Williams. He said that his visits to the house were short and that he was there solely for the purchase of drugs. Mr. Addeo testified that he communicated with Defendant Williams directly and that he called him and purchased drugs on a daily basis. Mr. Addeo said that Ms. Broyles contacted him and told him that it was no longer "safe" to purchase drugs from 5131 Spring Valley. Ms. Jones then informed him that he should go to 1926 Massachusetts to purchase drugs. Ms. Jones had moved to that residence with Mr. Miller.

Mr. Addeo said that, when he wanted to purchase heroin from 1926

9

Massachusetts, he would call Defendant Williams or Ms. Jones. When he arrived, he went in the front door and then he went into a room to the right that was minimally furnished where Defendant Williams sold him drugs. When Mr. Addeo gave Defendant Williams the money, Defendant Williams would place it in his pocket.

Tiffany Jones testified that she was an opiate addict and that she knew Defendant Williams, whom she called "Mumbles," because she bought heroin from him. She said she had also purchased heroin from Defendant Abrams, and she knew Defendant Click and Co-Defendant Arwood as other people who purchased heroin from Defendant Williams.

Ms. Jones testified that, before 2012, she moved into 5131 Spring Valley where she lived with her boyfriend, Derrick Miller, her aunt, Susan Broyles, and Ms. Broyles's boyfriend, Sean Cruz. Ms. Jones said that Defendant Williams came to the home and sold drugs from there. He never stayed the night, but he gave Ms. Broyles money with which to pay the rent. Ms. Jones recalled that Defendant Williams would arrive early in the day, give them each a "fix" of heroin that he called their "wake up," and stay at the house all day selling drugs from his office. Defendant Williams and Ms. Broyles also had a tree and lawn business that Ms. Broyles also ran out of the office. Ms. Jones said that the heroin sold by the Defendant was prepackaged in little baggies that were sealed "with a lighter, melted, and clipped together." Defendant Williams gave her two to three baggies, for her personal use, in the morning every day. This continued for the duration of the time she lived 5131 Spring Valley. Ms. Jones said that Defendant Williams gave Ms. Broyles three to five baggies each day, Mr. Miller approximately three baggies each day, and Mr. Cruz three to five baggies each day.

Ms. Jones said that, after her morning fix, she would go to a job site for the tree and lawn service, where she would be paid by whoever had hired the company. She then spent that money on heroin. She said she used between eight and ten bags of heroin per day, and Mr. Miller used between ten to fifteen bags each day, as did Mr. Cruz.

Ms. Jones said that, while she lived at 5131 Spring Valley, she began selling heroin to other people. She would purchase the baggies of heroin from Defendant Williams for ten dollars each and then sell each baggie for between fifteen and twenty dollars. She said that, on occasion, she would pay Defendant Williams $100 for twelve bags of heroin. She would keep two bags and resell the other ten. Ms. Jones estimated that she had between five and ten customers, one of whom was her ex-boyfriend James Vaughn, whom people called "Chaos." Originally Mr. Vaughn purchased between ten and twenty bags from her each day but, after she moved to 1926 Massachusetts Avenue, he began purchasing between twenty and thirty bags each day. She described Mr. Vaughn as her best customer.

Ms. Jones testified that Defendant Williams knew that she was reselling some of the heroin she had purchased from him. She said that she was sometimes present in the office when other people were purchasing heroin from Defendant Williams, including: Ms. Broyles, Mr. Miller, and Defendant Click. Ms. Jones said that, originally, Defendant Click and Co-Defendant Arwood were not allowed to go into the office with Defendant Williams, and Ms. Jones acted as the intermediary, charging them bags of heroin as payment for her services. Ms. Broyles, Ms. Christian, and Mr. Addeo also acted as intermediaries for Defendant Click and Co-Defendant Arwood. Eventually, Defendant Click and Co-Defendant Arwood were given direct access to Defendant Williams in the office while he was still dealing from 5131 Spring Valley. The two would come to the home every day, sometimes driving a Mustang and sometimes in a truck, and they would purchase heroin. Even after the two had direct access to Defendant Williams, they sometimes called Ms. Jones to find out if Defendant Williams were present at 5131 Spring Valley.

Ms. Jones testified that, if Defendant Williams were unavailable and she still needed heroin, she would contact Defendant Abrams. Similarly, if Defendant Williams ever ran out of heroin, he told Ms. Jones to contact Defendant Abrams. Ms. Jones said that Defendant Abrams sold drugs out of an apartment, and she said she had seen Defendant Williams in the apartment with Defendant Abrams. Defendant Abrams sold heroin packaged similarly to the heroin sold by Defendant Williams, and Ms. Jones had purchased heroin from both men at the apartment on different occasions. Ms. Jones testified that she had also purchased heroin from Defendant Abrams while he was at his house on 1423 Pickett Avenue ("1423 Pickett"). She said she parked in the alley behind the house and went into the house to purchase the heroin. Ms. Jones testified that she had seen Defendant Williams at this location also, and she purchased heroin from both him and Defendant Abrams at this location on different occasions. Ms. Jones said that, when she purchased heroin from Defendant Abrams, she bought ten bags for $100, and he never gave her any extra bags.

Ms. Jones testified that Defendant Williams had her purchase small baggies for him to put heroin into. She purchased them at "a place off of downtown," and she purchased the baggies in both black and in colors, including pink. She saw Defendant Williams put heroin into the baggies. She saw him "bagging heroin" at 5131 Spring Valley, at 1926 Massachusetts Avenue, and at Defendant Abrams's apartment. Defendant Abrams was present when Defendant Williams packaged heroin at his apartment. Defendant Williams used the cap of a Bic pen to dip small amounts of heroin out of a larger supply in a sandwich-sized Ziploc baggie and distribute it into smaller baggies.

11

Ms. Jones recounted that Mr. Miller bought "pure" heroin from Defendant Williams on approximately five occasions. She was unsure of the pricing, but said that it was packaged differently from the powder. Defendant Williams sold it to them as a "rock" inside a sandwich-sized plastic Ziploc baggie.

Ms. Jones testified that, while she was living at 5131 Spring Valley, she heard Defendant Click and Co-Defendant Arwood discussing reselling the heroin that they purchased in Sevier County for approximately $20 per bag. She said that Defendant Click usually came to purchase heroin with two or three hundred dollars at a time. One time, he came with eight hundred dollars to purchase heroin. Co-Defendant Arwood usually brought two or three hundred dollars when she came to purchase heroin. Ms. Jones testified that she never saw Defendant Click and Co-Defendant Arwood come separately to the home.

Ms. Jones said that while she was living at 5131 Spring Valley, her relationship with her aunt, Ms. Broyles, became strained. Defendant Williams also expressed to Ms. Jones his frustration with Ms. Broyles, in part based upon Ms. Broyles' purchasing heroin from someone other than him. Ms. Jones said that she therefore moved to the house located at 1926 Massachusetts where she lived with Mr. Miller. While Defendant Williams did not live at the home, he paid the rent and the utilities at the home, and he paid Ms. Jones some amount of money for her move. He also purchased her a Jeep Cherokee so that she could meet people without having to purchase rides. Defendant Williams came to the home to sell heroin, but he never stayed the night there. He sold heroin out of the master bedroom of the house, which had an attached bathroom. The only furnishings in the room were a large table and a smaller table upon which a television sat.

Ms. Jones said that, after the move, she retained her customers, who came to 1926 Massachusetts to purchase heroin from her. She explained that her customers would contact her and, if Defendant Williams were at 1926 Massachusetts, she would tell them to come there to make the heroin purchase. She then took their money, went into Defendant Williams's office, exchanged the money for the drugs, and brought the drugs back to her customer. Defendant Williams gave her extra bags of drugs for making the exchange. She would also ask her customers to give her one of their bags for her efforts. She estimated that she purchased heroin for herself or her customers from Defendant Williams approximately fifteen to twenty times per day. She recalled that Mr. Addeo and Ms. Christian would purchase drugs at 1926 Massachusetts as many as five times per day. At this point, Ms. Jones was consuming between ten and twenty bags of heroin a day, and Mr. Miller was consuming between twenty and thirty bags per day.

Ms. Jones recalled that Mr. Vaughn purchased between twenty to thirty bags of

heroin from her, which she got from Defendant Williams every day or every other day. Defendant Click also purchased "hundreds of dollars worth" of heroin every day or every other day from Defendant Williams. Co-Defendant Arwood also purchased heroin every day or every other day. Defendant Click and Co-Defendant Arwood purchased heroin from Defendant Williams.

Ms. Jones reiterated that, if she could not purchase heroin from Defendant Williams but needed it, she would purchase it from Defendant Abrams at Townview Apartments. She also purchased heroin from "Jerome Brewer" a/k/a "Rome," at the same location. Defendant Williams had given Ms. Jones the contact information for both Defendant Abrams and Mr. Brewer.

Ms. Jones said that she knew the CI that worked with Detective Jinks because he was her best friend's ex-boyfriend. The CI and her best friend, Crystal, had purchased heroin from Defendant Williams at both 5131 Spring Valley and 1926 Massachusetts. She acted as an intermediary between the CI and Defendant Williams. Ms. Jones said that Defendant Williams purchased a maroon car from the CI. Ms. Jones identified a recording of a phone conversation between the CI and herself. She said that, during the conversation, the CI asked her if it was "good" to come over, which she understood to mean was Defendant Williams present and available to sell him heroin. During the conversation, the two also discussed Crystal receiving drug treatment at Bradford. The State showed the videotaped drug transaction, and Ms. Jones answered questions regarding the drug purchase. She identified Defendant Williams's car in the video parked in the backyard of 1926 Massachusetts. She identified Mr. Addeo. She said that, when she was not on the video, she had gone into the bedroom to get heroin for the CI. She identified the bags of heroin being exchanged on the video. She identified a second video of a similar drug transaction during which the CI brought money to her at 1926 Massachusetts, and she gave the money to Defendant Williams, who gave her heroin in exchange, and she then gave those baggies to the CI.

Ms. Jones described the events leading to the search warrant execution and her subsequent arrest. She said that she was at 1926 Massachusetts with her friends "Patrick and Skye," both of whom were there to purchase heroin from Defendant Williams. Defendant Williams was not yet there, and they noticed an unmarked police car outside. She called Defendant Williams to let him know, but the car left, so she hung up without informing Defendant Williams about the car. Ms. Jones said that the parties present were anxious to get the drugs that they wanted. When Defendant Williams arrived, he went into the bedroom from which he sold drugs. Ms. Jones followed him and got some drugs for "Patrick." She came out of the bedroom and then returned to the bedroom to purchase more drugs, at which time the police entered the home and ordered everyone to get onto the floor. Ms. Jones said that Defendant Williams ran to the bathroom where

police apprehended him.

Ms. Jones identified some photographs taken by police at 1926 Massachusetts. She identified a picture of her phone. She said that Defendant Williams had a key to 1926 Massachusetts, which she had given to him on a pink key ring that bore her name. She also identified needles, which she explained that she used to inject drugs. She identified Defendant Williams's prepaid cell phone, which he had told her was not traceable.

Ms. Jones testified about the contact information found on her phone. She said that Ms. Stafford was a customer who called her to purchase heroin. She identified contact information for Ms. Broyles; Mr. Vaughn; Defendant Click and Co-Defendant Arwood (who both used the same phone); Mr. Miller; Defendant Abrams; Mr. Addeo; and Defendant Williams.

Ms. Jones then identified text messages exchanged between her phone and the contacts listed above that referenced the sale or purchase of heroin. In one of those messages; Ms. Jones stated that Defendant Williams was out of heroin but that she could purchase some from Defendant Abrams. Ms. Jones identified multiple messages in which she arranged for the purchase of heroin from Defendant Williams or Defendant Abrams. She said that she sent a message on January 14, 2013, in which she asked to purchase heroin from Defendant Abrams. She then read a message from her to Mr. Vaughn from January 15, 2013, before the search warrant was executed, in which she discussed his coming to purchase heroin at 1926 Massachusetts when Defendant Williams arrived.

Ms. Jones identified a text message from Defendant Williams's cell phone to Defendant Abrams in which Defendant Williams complained about a woman named "Brandy" bringing Ms. Broyles, who was wearing a law-enforcement-issued monitoring ankle bracelet, to the home from which he sold heroin. Ms. Jones said that, in response to this event, Defendant Williams told her to get a new cell phone and not give the contact information to Ms. Broyles.

During cross-examination, Ms. Jones testified that, when she spoke with Detective Jinks, she used the word "medicine" to describe the heroin. Ms. Jones said that she moved into 5131 Spring Valley shortly after Ms. Broyles moved there. Ms. Jones said that Defendant Williams gave both she and Ms. Broyles free heroin on occasion. Ms. Jones said that, during the time that she was selling and using heroin, she could not go a day without using. If she could not get in touch with Defendant Williams or Defendant Abrams, she would contact "Mall." When she purchased drugs from "Mall," they were packaged differently. Ms. Broyles also put Ms. Jones in contact with a dealer named

"D," but Ms. Jones did not purchase from him frequently because she did not like his product. Ms. Jones testified that she felt that she was more of a drug user than a drug dealer. She said that she felt that she was helping other people from being sick in order to keep herself from being sick.

Upon questioning by Defendant Abrams's attorney, Ms. Jones said that she knew Defendant Abrams from when she lived at 5131 Spring Valley, recognizing him as someone who sold other drugs from Townview Apartments. Ms. Jones said that she occasionally used crack cocaine, but it was not as addictive to her. She was unsure whether she mentioned Defendant Abrams during the first interview with Detective Jinks.

Upon further questioning, she said that she also did not mention Defendant Click or Co-Defendant Arwood during her first interview. She said she only served as a middle man for Defendant Click and Co-Defendant Arwood "[a] few times." She agreed that she had seen Defendant Click use up to five bags of heroin intravenously at a single time. Ms. Jones opined that she could not do the same and that she had only ever used two bags simultaneously.

Derrick Miller, Ms. Jones's boyfriend, testified that he was a recovering drug addict who had abused heroin and that he had a prior criminal history. Mr. Miller testified that he knew Defendants Williams and Abrams. He confirmed that he lived at 5131 Spring Valley with Ms. Broyles and Ms. Jones and that, while he lived there, he primarily purchased his heroin from Defendant Williams. Mr. Miller confirmed Ms. Jones's testimony about moving to the house at 1926 Massachusetts and about Defendant Williams's selling heroin from that house. Mr. Miller testified that he purchased heroin directly from Defendant Williams for himself and for others. Defendant Williams often gave him an extra bag or two in return for his sales. Mr. Miller confirmed that he called Defendant Abrams to get heroin if Defendant Williams were unavailable. He said that he used his cell phone to contact Defendants Williams and Abrams to arrange for the purchase of heroin. Mr. Miller testified that he purchased heroin from Defendant Abrams at the Townview Apartments, located at 442 Arbor Place, or at Defendant Abrams's apartment on Pickett Avenue. He purchased heroin from Defendant Abrams at 1423 Pickett on "countless" occasions, at least forty or fifty. Mr. Miller described the Townview Apartments where he also purchased heroin. Mr. Miller testified that he had seen Defendant Click and Co-Defendant Arwood at 1926 Massachusetts purchasing heroin from Defendant Williams.

Melissa Thomas, with the Department of Human Services child care licensing, testified that her responsibilities included keeping track of the day care and child care facilities in Knox County, Tennessee. Ms. Thomas said that there was a child care facility, "Thomas' Tiny Tots," which was located at 3201 Sanderson Road in Knoxville,

15

Tennessee and continuously in operation between June 2012 and March 2013. She identified a second child care facility, "Marcia's Family Home Day Care," which was located at 1411 Exeter Road, and continuously in operation between June 2012 and March 2013. Ms. Thomas identified a third child care facility, "Y Child Care Agency" located at 800 Townview Drive, which was in existence between June 2012 and March 2013.

Douglas Ryerkerk, who was employed with Knox County School Security, testified that Green Magnet School was a public school that was in existence in June 2012 through March 2013 and located on Townview Drive. He identified Maynard Elementary School as another public school that was located on College Drive and said that it was open between June 2012 and March 2013.

Donna Roach testified that she worked for the Knox County Geographic Information System, a department which created maps that included drug-free zones, etc. The Townview Apartments located on Arbor Place also fell within several school and day care drug-free zones. 1423 Pickett Avenue also fell within a school zone.

John Turner, a detective with the City of Sevierville Police Department, testified that he was assigned to the narcotics division. As part of one of his investigations, he developed a confidential informant ("CI 2"). CI 2 came to Detective Turner wanting to earn money for undercover drug purchases, informing him that he could call Defendant Click to make a heroin purchase. In September 2012, CI 2 made purchases in Sevier County from Defendant Click and Co-Defendant Arwood. Detective Turner testified that the purchase was initiated by CI 2 calling the Defendant Click's phone number to arrange a drug purchase on September 5, 2012. The detective testified about the subsequent drug transaction that occurred between CI 2 and Defendant Click in which the CI gave Defendant Click and Co-Defendant Arwood $25 in exchange for a blue Ziploc baggie, the top of which appeared to be heat-sealed, that appeared to contain heroin. Detective Turner testified that a similar transaction occurred on September 10, 2012, during which CI 2 purchased from Defendant Click a substance that appeared to be heroin, packaged similarly to the September 5 purchase. Detective Turner testified that CI 2 arranged a third drug purchase on September 11, 2012, and the drug transaction occurred similarly to the other two, with Defendant Click and Co-Defendant Arwood providing the drugs packaged consistently with the other two drug buys in exchange for money. Detective Turner video recorded the drug transactions, copies of which the State offered into evidence.

Detective Turner testified that he was present when Co-Defendant Arwood made her statement to police on January 24, 2013. She told officers that she purchased her heroin in Knoxville from "Jersey" and "Mumbles" for ten dollars a bag and then returned

to Sevierville and sold them for between fifteen and twenty dollars a bag.

CI 2 testified and confirmed Detective Turner's testimony about the drug transactions. He agreed he was at the time of trial incarcerated on charges of promotion of methamphetamine manufacture; his arrest occurring after he worked for law enforcement in this case. He conceded that he had prior convictions. CI 2 said he and Defendant Click had known each other for CI2's whole life, and, when the two spoke in August 2012, Defendant Click mentioned that he could get CI 2 heroin. CI 2 approached Detective Turner with this information, which led to the controlled drug buys. CI 2 said that each time that he purchased heroin from Defendant Click, Co-Defendant Arwood accompanied Defendant Click, and on two of those occasions Co-Defendant Arwood was driving the car in which the two arrived.

During cross-examination, CI 2 testified that he knew that both Defendant Click and Co-Defendant Arwood were drug users. He said that he had never seen Defendant Williams before the trial. He agreed that he and Defendant Click used heroin together after the controlled drug buys in this case.

Erica Stoner, a TBI special agent forensic scientist, testified that she tested the evidence from the three controlled drug buys conducted by Detective Turner and CI 2. She confirmed that the evidence tested was heroin in the following amounts: 0.05 grams, 0.07 grams, and 0.07 grams, respectively.

Phillip Major, a sergeant with the Knoxville Police Department, testified that he set up surveillance at 1423 Pickett as part of this investigation. He saw Defendant Abrams leave this address and get into his vehicle, and Sergeant Major arrested Defendant Abrams on March 21, 2013. He said that, also as part of this investigation, he met with Defendant Abrams's girlfriend, Ms. Parker. He called her cell phone while in her presence and determined that her cell phone number was 865-230-XXXX.[5]

Dan Crowe testified that he owned 1423 Pickett and that Ms. Parker leased that home from him and had since April 2012. At the time of trial, she still occupied and paid for the residence. Mr. Crowe said that he saw Defendant Abrams present at the house at times when Mr. Crowe repaired something for the tenants. During cross-examination, Mr. Crowe testified that Pickett Avenue was a "quiet" street, and he did not notice an excessive amount of traffic at the house.

Carrie Roe testified that she was a recovering drug addict, and she had purchased drugs from Defendant Abrams. Ms. Roe said that she began by using five bags of heroin

---

[5] For privacy, we will omit the last four digits of the phone number.

a day, but, at her peak, she consumed between ten and fifteen bags of heroin per day. Ms. Roe said that she had intermittently sold drugs to support her habit. She said that, between June 2012 and March 2013 when she was selling and using heroin, she lived in Townview Towers, which was walking distance from Arbor Place. She said she would text Defendant Abrams to purchase heroin and then meet him at Arbor Place apartments, number 442. Ms. Roe said that she went through "parking lot C," and then to Defendant Abrams's apartment on the top floor. Ms. Roe testified that she had also cleaned Defendant Abrams's apartment for two bags of heroin. She described the bags that she purchased for $10 per bag and that he gave her for work as "little black bags" that were heat-sealed on the top. Ms. Roe testified that she only saw Defendant Abrams at the apartment in the evening.

Ms. Roe testified that Defendant Abrams told her that if he were unavailable for the purchase of heroin, Ms. Roe could contact Jerome Brewer. Ms. Roe said that she also purchased heroin from Mr. Addeo and Ms. Christian, who also lived at Townview, and with whom she sometimes resided. She said that she had accompanied Mr. Addeo and Ms. Christian to go purchase heroin at a house on Massachusetts Avenue, but she said that she always stayed in the car.

During cross-examination, Ms. Roe said that she had gotten heroin from "Mumbles" before but that it was always through a third party. She said she had never seen Defendant Williams. Ms. Roe testified that she also used crack cocaine at the time of these events. Upon further cross-examination, Ms. Roe testified that she had empty bags of heroin in her possession at the time of her arrest. Ms. Roe agreed that she also used a third party to purchase heroin from "Mall." Ms. Roe looked through her phone and agreed that there were no messages sent to Defendant Abrams's phone. There were, however, text messages sent to Mr. Brewer, Mr. Addeo, and Ms. Christian.

Charles Nelson testified he worked for Laurel Wood Housing, which managed Arbor Place Apartments. Stephanie Parker leased apartment number 442, and her lease was terminated on April 2, 2013.

The parties then stipulated that Defendant Williams had a prior felony drug-related conviction.

Based upon this evidence, the jury convicted Defendants Williams, Click, and Abrams of twelve counts of conspiracy to possess or sell heroin and that the offenses occurred within 1000 feet of a drug-free school zone ("DFSZ"). The jury additionally convicted Defendant Williams of multiple other drug and firearms-related offenses. The trial court merged the conspiracy to sell convictions into one conviction for each defendant. It is from these judgments that the defendants now appeal.

## II. Analysis

On appeal, Defendants Williams and Click contend that the trial court erred when it failed to hold a pretrial hearing to determine whether a conspiracy existed. All three defendants contend that the evidence is insufficient to sustain their convictions for conspiracy. Defendant Click additionally contends that the trial court erred when it allowed him to be convicted of the common law crime of conspiracy.

### A. Pretrial Hearing Regarding Existence of Conspiracy

Defendants Williams and Click contend that the trial court erred when it failed to hold a pretrial hearing to determine whether a conspiracy existed. They note that they filed a motion for a pretrial hearing on November 20, 2013, which the trial court heard and denied. In its order, the defendants note, the trial court stated that the State had declared its intention not to introduce any statements made by co-conspirators to law enforcement. The defendants assert that at trial, however, the State's witnesses testified to hearsay statements made by co-conspirators; Defendant Williams calling the proceeding "hearsay drunk." The defendants claim that the trial court's failure to hold a pretrial hearing about whether a conspiracy existed opened up a "Pandora's box" of inadmissible evidence and prohibited the defendants from confronting their accusers. The State counters that pursuant to Tennessee law the trial court is permitted to make a ruling on the existence of a conspiracy after hearing the State's evidence, which is what the trial court did in this case. The State posits that there was, therefore, no error.

The "Pandora's box" referred to by the defendants herein, refers to hearsay statements admitted by the trial court during the trial over the defendants' objections.[6] Hearsay is an out-of-court statement offered in court "to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). However, Tennessee Rule of Evidence 803(1.2)(E) provides an exception to the hearsay rule for a statement offered against a party that is a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy. "A conspiracy is defined as a combination between two or more persons to do a criminal or unlawful act . . . ." *State v. Alley*, 968 S.W.2d 314, 316 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 39-12-103(a) (2018) states the offense of conspiracy is committed if:

> two (2) or more people, each having the culpable mental state required for
> the offense which is the object of the conspiracy and each acting for the

---

6 While the State has agreed pretrial not to admit statements made by co-conspirators to law enforcement, the trial court ruled on each objection made by the defendants, finding that in some instances that the testimony was cumulative or elicited in response to questions posed by the defendants' attorneys.

purpose of promoting or facilitating commission of an offense, agreed that one (1) or more of them will engage in conduct which constitutes such offense.

A conspiracy can be shown by "an implied understanding between the parties," circumstantial evidence, and the conduct of the parties. *State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992).

In *State v. Hodgkinson*, 778 S.W.2d 54, 61 (Tenn. Crim. App. 1989), this court held that co-conspirator hearsay may be admitted pursuant to Tennessee Rule of Evidence 803 (1.2)(E) when: "(1) the declaration was made in furtherance of the conspiracy; (2) it was made during the pendency of the conspiracy; and (3) there is independent proof of the existence of the conspiracy and the connection of the defendant to the declarant and the defendant to do it." *State v. Hutchison*, 898 S.W.2d 161, 169 (Tenn. 1994) (citing *Hodgkinson*, 778 S.W.2d at 61). Tennessee Rule of Evidence 803(1.2)(E) does not require the trial court to determine that a conspiracy existed before allowing a co-conspirator's statements into evidence. *See* N. Cohen, D. Paine, and S. Sheppeard, *Tennessee Law of Evidence*, § 803(102) (2nd ed. 1990). Further, Tennessee Rule of Evidence 104(b) permits the trial court to allow the introduction of proof subject to the subsequent introduction of evidence that would make it relevant. Thus, while some initial proof of a conspiracy is required before the introduction of a co-conspirator's declarations, the trial judge may permit the declaration conditioned on the fact that a conspiracy will later be established by additional evidence. *See Gaylor*, 862 S.W.2d at 553. In summary, the requirement of independent proof of conspiracy may be satisfied *after* the admission of evidence. *Hutchinson*, 898 S.W.2d at 169 (citing *Solomon v. State*, 76 S.W.2d 331 (1934)).

The Sixth Circuit Court of Appeal articulated its standard for admitting co-conspirator hearsay in *United States v. Vinson*, 606 F.2d 149, 153 (6th Cir. 1979), *cert. denied*, 444 U.S. 1074, *reh'g denied*, 445 U.S. 972 (1980). In *Vinson*, the Sixth Circuit held that a defendant can make a "continuing" hearsay objection while the statements of conspirators are admitted pending a finding that a conspiracy exists. *Id. Vinson* emphasizes the importance of the court's eventual explicit finding that a conspiracy was more likely than not to have existed being clearly stated. *Id.*

The record evinces, and the defendants agree, that the trial court in this case made an explicit finding that a conspiracy existed. We turn, therefore, to address whether the trial court erred when it did not make this finding pretrial. *United State v. James*, 590 F.2d 575 (6th Cir. 1997), cited by Defendant Williams, states that, when it is reasonably practical, the trial court should require the showing of a conspiracy before admitting declarations of a co-conspirator. That said, the *James* opinion goes on to state that if the

20

trial court determines that it is not reasonably practical to require this showing before admitting evidence, the trial court may admit the statement subject to the conspiracy being proven later. *Id.* As always, determinations about the admissibility of evidence rest within the trial court's sound discretion, and this court will not overturn a trial court's decision regarding the admissibility of evidence absent an abuse of that discretion. *State v. Clayton*, 535 S.W.3d 829, 859 (Tenn. 2017). A trial court is found to have abused its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *State v. Lewis*, 235 S.W.3d 136, 141 (2007) (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

The trial court in this case ruled on the defendants' motion for a pretrial determination about the existence of a conspiracy. The trial court denied the motion, finding that due to the number of defendants and witnesses it would be extremely impractical and inefficient to have what would amount to a trial before the trial to determine the existence of a conspiracy. We conclude that the trial court did not abuse its discretion in this regard. As previously stated, a trial court may admit statements of co-conspirators before it makes the determination that a conspiracy existed. The trial court chose this course in this case, ultimately determining after hearing the evidence that a conspiracy existed. This was not an abuse of its discretion, and the defendants are not entitled to relief as to this issue.

### B. Sufficiency of Evidence of Conspiracy

Defendants Williams, Abrams, and Click all contend that the evidence is insufficient to sustain that a conspiracy occurred or that the conspiracy in this case occurred within a Drug Free School Zone ("DFSZ"). They argue that the State failed to prove that there was a formal or expressed agreement, as required to prove a conspiracy, between them or anyone else to sell heroin. They further contend that the jury rejected the only "overt act" listed in the presentment as occurring within a DFSZ and, therefore, their conviction for the DFSZ conspiracy should be reversed and dismissed. The State counters that the State offered evidence that Defendant Williams used Defendant Click as an intermediary between himself and other heroin buyers. It further presented evidence that Defendant Williams told his intermediaries to purchase heroin from Defendant Abrams in the event that he was out of town or unavailable to sell heroin to them. The State further contends that, while the jury declined to find the defendants guilty of the offense elected to have occurred in a school zone, the jury considered the evidence and properly determined that the conspiracy occurred within a school zone.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the

21

State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and

legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Before deciding whether the DFSZ penalty applies, we must first determine whether the proof is sufficient to prove that the defendants conspired to possess heroin with the intent to sell. The defendants were charged with conspiracy to possess heroin with the intent to sell, an offense that requires the prosecution to prove that:

> two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agreed that one (1) or more of them will engage in conduct which constitutes such offense.

T.C.A. § 39-12-103(a). A conspiracy is "an agreement to accomplish a criminal or unlawful act." *State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998). The agreement "need not be formal or expressed, and it may be proven by circumstantial evidence." *Id.* "'Conspiracy implies concert of design and not participation in every detail of execution.'" *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993) (quoting *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978)). "No person may be convicted of conspiracy to commit an offense unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." T.C.A. § 39-12-103(d) (2018).

### 1. Conspiracy to Possess Heroin

In this case, the convictions all merged into Count 1, which was conspiracy to possess over 150 grams of heroin with the intent to sell or deliver. Our Criminal Code provides that "[i]t is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell such controlled substance." T.C.A. § 39-17-417(a)(4) (2018). Heroin is a Schedule I controlled substance. T.C.A. § 39-17-406(c)(11) (2018).

We conclude that the State offered sufficient proof to sustain the defendants' convictions. The evidence showed that Defendant Williams packaged heroin for resale into small heat-sealed Ziploc baggies. He did this in the presence of Defendant Abrams. Defendant Williams did not allow just anyone to come into his office and purchase

23

heroin, but he required that they go through an intermediary, to whom Defendant Williams gave extra heroin for their efforts. Among the intermediaries were Ms. Jones, Ms. Broyles, Ms. Christian, Mr. Addeo, Defendant Click and Co-Defendant Arwood. In fact, Defendant Williams used Ms. Jones as an intermediary, as seen in the video recorded transactions with the CI. When Defendant Williams ran out of heroin, he encouraged his intermediaries to purchase heroin from Defendant Abrams, who then sold them heroin. Both Ms. Jones and Mr. Addeo purchased heroin, packaged and priced similarly, from Defendant Abrams on multiple, even "countless" occasions. Defendant Williams sold heroin to Defendant Click and Co-Defendant Arwood, who then resold the heroin in Sevierville. Multiple witnesses testified that Defendant Williams and Defendant Abrams knew that they were reselling the heroin that they purchased. The jury properly concluded that the evidence was sufficient to prove that there was an agreement among the defendants to possess heroin with the intent to sell. The amount of heroin possessed, as testified to by witnesses, was over 150 grams.

We further conclude that the evidence was sufficient to prove that the defendants each committed an overt act in furtherance of the conspiracy. As previously stated, "No person may be convicted of conspiracy to commit an offense unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." T.C.A. § 39-12-103(d) (2018). The State offered four overt acts to support the conspiracy convictions:

1.      Defendant . . . Williams distributed more than 150 grams of heroin to [Co-Defendant] Arwood, [Defendant] Click, [Ms.] Christian, [Mr.] Addeo, [Ms.] Jones, [Mr.] Miller, and Susan Broyles.

2.      Defendant . . . Abrams distributed heroin to . . . [Ms.] Roe within one thousand feet of a public school, child care agency, and public park;

3.      [Co-]Defendant . . . Arwood received heroin from [Mr.] Addeo and [Defendant] Williams for further distribution;

4.      Defendant . . . Click received heroin from [Mr.] Addeo and [Defendant] Williams for further distribution.

The jury found that the State had proven overt acts 1, 3, and 4 beyond a reasonable doubt, but it found that the State had not proven overt act 2 beyond a reasonable doubt. The evidence presented supports the jury's finding. The evidence presented showed that Defendant Williams sold heroin to the aforementioned intermediaries, many of whom testified at the trial. Their testimony clearly supported that the amount of heroin sold was

24

over 150 grams. The testimony further indicated that both Co-Defendant Arwood and Defendant Click purchased heroin from Defendant Williams and resold that heroin. Because we previously concluded that the evidence sufficiently proved an agreement among all four defendants and because we now conclude that it sufficiently proved that an overt act in furtherance of the conspiracy was committed by at least one of the defendants, we conclude that the evidence is sufficient to support all three defendants' convictions for conspiracy to possess with intent to sell or deliver 150 grams or more of heroin.

## 2. DFSZ Penalty

As previously stated, the defendants take issue with the DFSZ penalty being applied. They acknowledge that cases from this court have held that proof that the drug offense was committed in a DFSZ is not an essential element of the offense but rather only subjects a defendant to an enhanced penalty if the jury determines beyond a reasonable doubt that any part of the sale occurred within a DFSZ. They contend, however, that in accordance with law from the United States Supreme Court, because the DFSZ Act increases the penalty for a crime beyond the statutory maximum then it must be submitted to a jury as an element of the offense, citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

We disagree with the defendants and decline to reject the precedent of this court. This court has made clear that the Drug-Free School Zone Act does not create a separate criminal offense but "merely imposes a harsher penalty for violations of Tenn[essee] Code Ann[otated section] 39-17-417 occurring within a [drug free] zone." *State v. Smith*, 48 S.W.3d 159, 168 (Tenn. Crim. App. 2000); *see* T.C.A. § 39-17-432(b). Therefore, "proof that the drug crime was committed in a [drug free] zone is not an essential element of the 39-17-417 offense." *State v. Arturo Jaimes-Garcia*, No. M2009-00891-CCA-R3-CD, 2010 WL 5343286, at *18 (Tenn. Crim. App. Dec. 22, 2010), *perm. app. denied* (Tenn. May 31, 2011). Thus, for a person charged with selling or possessing a controlled substance, the enhanced penalty is triggered if the jury determines beyond a reasonable doubt that any part of the sale or possession occurred in a drug free zone. *See State v. Timothy Allen Johnson*, No. M2015-01160-CCA-R3-CD, 2016 WL 3435589, at *4 (Tenn. Crim. App. June 15, 2016) (holding evidence sufficient to support conviction for sale within a school zone when location where money was exchanged was within the school zone even though drugs were exchanged after defendant and undercover officer left that location), *perm. app. denied* (Tenn. Oct. 19, 2016); *cf. Arturo Jaimes-Garcia*, 2010 WL 5343286, at *13 (rejecting defendant's contention that conviction for conspiracy to sell 300 grams or more of cocaine in a drug free school zone required proof of an agreement to sell within a school zone and holding that enhanced penalty was triggered when defendant's overt act in furtherance of the conspiracy took him within

25

1000 feet of a school); *see also State v. Cody Darand Marks*, No. M2018-00020-CCA-R3-CD, 2018 WL 6992553, at *4 (Tenn. Crim. App., at Nashville, Nov. 13, 2018), *perm. app. denied* (Tenn. Mar. 28, 2019).

Under the Drug-Free School Zone Act, when the offense occurs within 1000 feet "of the real property that comprises a . . . preschool, child care agency, or public library, recreational center or park . . . ." T.C.A. § 39-17-432(b)(1), (3). The defendant "shall be required to serve at least the minimum sentence for the defendant's appropriate range." T.C.A. § 39-17-432(c). This section is part of the Drug–Free School Zone Act, which is intended to "provid[e] all students in this state an environment in which they can learn without the distractions and dangers that are incident to the occurrence of [illegal] drug activity in or around school facilities." T.C.A. § 39-17-432(a); *see also State v. Fields*, 40 S.W.3d 435, 439 (Tenn. 2001).

To support their allegation of conspiracy to sell heroin in a DFSZ, in counts 1, 2 and 7, 8 the State alleged:

The Grand Jurors for the State of Tennessee, upon their oaths, present that [Defendant] Williams . . . [Defendant] Abrams . . . [Defendant] Click . . . and [Co-Defendant] Arwood . . . on or about the last day of June, 2012, and on . . . diverse dates between that date and the 14th day of March, 2013, in [Knox County, Tennessee] . . . did knowingly conspire and agree with another, and with others known and unknown to the Grand Jury, that one or more of them would engage in conduct that constitutes the offense of possession with intent to sell 150 grams or more of a substance containing heroin, a Schedule I controlled substance, and that at least one overt act of the conspiracy occurred within one thousand feet of the real property that comprises a school, with each defendant having the culpable mental state required for the commission of the offense, and with each defendant acting for the purpose of promoting or facilitating the commission of the offense, and in furtherance of the conspiracy, at least one defendant committed the following overt acts:

1. Defendant . . . Williams distributed more than 150 grams of heroin to [Co-Defendant] Arwood, [Defendant] Click, [Ms.] Christian, [Mr.] Addeo, [Ms.] Jones, [Mr.] Miller, and Susan Broyles.

2. Defendant . . . Abrams distributed heroin to . . . [Ms.] Roe within one thousand feet of a public school, child care agency, and public park;

3. [Co-]Defendant . . . Arwood received heroin from [Mr.] Addeo and

26

[Defendant] Williams for further distribution;

4.  Defendant . . . Click received heroin from [Mr.] Addeo and [Defendant] Williams for further distribution.

Relying on the same overt acts, the State alleged similar facts in Counts 3-6 and 9-12 but, in Count 3, 4, 9 and 10, the State alleged that the conspiracy occurred within 1000 feet of real property that comprises a child care agency and, in Count 5, 6, 11 and 12, the State alleged that the conspiracy occurred within 1000 feet of a park.

When the jury announced its verdict, it announced for each count and for each defendant:

> We, the jury, find the defendant . . . guilty of conspiracy to possess with the intent to sell a substance containing heroin, a schedule I controlled substance . . . [in] the amount of 150 grams or more . . . [and that] this occurred within a thousand feet of a school [child care center or park, respectively]. . . .

The jury then found that the State had proven overt acts 1, 3, and 4, but concluded that it had not proven overt act 2 occurred. The jury informed the trial court of the same decision in all twelve counts for all four defendants, each time affirmatively finding that the conspiracy occurred within 1000 feet of either a school, child care facility, or park.

The jury concluded that the four defendants conspired to sell heroin, and as previously discussed, the evidence is sufficient in that regard. It then informed the court that the three overt acts that it found to have occurred: Defendant Williams distributing heroin to the listed buyers; Defendant Williams distributing heroin to Defendant Click; and Defendant Williams selling heroin to Co-Defendant Arwood; took them into a DFSZ on multiple occasions, as indicated by the multiple counts. By its verdict, the jury affirmatively found that some part of the three overt acts it found proven occurred within a DFSZ. There was evidence presented that Defendant Williams sold heroin to the aforementioned buyers at Arbor Place Apartments, which was within 1000 feet of a school zone. There was also evidence that he sold heroin to Ms. Jones from 1423 Pickett, which was the home in which Defendant Abrams resided and which also was within a DFSZ. This court has previously stated, "Quite logically, the conspiracy to sell the drugs could have occurred anywhere and there may be an overt act by one of the conspirators that occurred inside a school zone. To hold otherwise would undermine the Legislature's intent when it enacted this statute." *Jaimes-Garcia*, 2010 WL 5343286, at *13. Accordingly, we conclude that, under these circumstances, a rational juror could infer that that each defendant conspired to sell heroin and that at least a portion of the

conspiracy occurred within a DFSZ. The defendants are not entitled to relief on this issue.

## C. Common Law Conspiracy

Defendant Click contends that the presentment in this case improperly charged him with a common law offense. He states that offense of conspiracy "to commit a drug free school zone is not contained within the Tennessee Code." We interpret that argument to mean that his conspiracy to possess with intent to sell heroin conviction, with the jury finding that the DFSZ penalty applied, is not an enumerated offense in the Tennessee Code and, as such, it is a "common law" crime, so his conviction should be dismissed. It appears that he takes issue with the State's inclusion of the DFSZ language within the body of the presentment.

Under both the United States and the Tennessee Constitutions, a charging instrument, such as an indictment, must inform the accused of "the nature and cause of the accusation." *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In addition to these constitutional guarantees, the form of an indictment in Tennessee is prescribed by statute. Tennessee Code Annotated § 40-13-202 directs that an indictment:

> state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment. . . .

At common law, pleading requirements for indictments were strict because the elements of criminal offenses were not easily ascertainable by reference to a statute. *State v. Hill*, 954 S.W.2d 725, 728 (Tenn. 1997). The Tennessee Supreme Court explained that an indictment is sufficient to satisfy the constitutional guarantees of notice to the accused if the indictment contains allegations that (1) enable the accused to know the accusation to which answer is required; (2) furnish the trial court an adequate basis for entry of a proper judgment; and (3) protect the accused from a subsequent prosecution for the same offense. *Id*. at 727 (citations omitted).

In *Hill*, the Court added that "an indictment need not conform to traditionally strict pleading requirements." *Id*. at 727. Since common law offenses no longer exist, "we now approach 'attacks upon indictments, especially of this kind, from the broad and enlightened standpoint of common sense and right reason rather than from the narrow standpoint of petty preciosity, pettifogging, technicality or hair splitting fault finding.'" *Hill*, 954 S.W.2d at 728 (quoting *United States v. Purvis*, 580 F.2d 853, 857 (5th Cir.

1978)).  In many decisions since *Hill* discussing the sufficiency of indictments, Tennessee courts have repeatedly emphasized the relaxation of strict common law pleading requirements.

In accordance with this law, we conclude that Defendant Click's presentment was not invalidated by the inclusion of the DFSZ language in the presentment.  The State in the presentment alleged that the Defendant had conspired to possess with the intent to sell or deliver heroin, citing Tennessee Code Annotated section 39-17-147, and that this conspiracy took place in a DFSZ, citing Tennessee Code Annotated section 39-17-432.  As the State's brief notes, it is bound to give Defendant Click notice that it sought to enhance his sentence pursuant to the DFSZ Act.  In so doing, it did not invalidate the presentment.  The presentment gave Defendant Click notice of the accusation against him, gave the trial court adequate basis for entry of a judgment, and protected the defendant from a subsequent prosecution for the same offense.  As such, the indictment was sufficient.  Defendant Click is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude that there was no error and, as such, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

29